# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6307 | **DATE** | 4/26/2001 |
| **CASE TITLE** | HILT-DYSON vs. CITY OF CHICAGO | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Pursuant to Memorandum Opinion and Order entered this day, defendant's motion for summary judgment is granted. This action is dismissed in its entirety. All pending motions are moot. All pending dates are stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | APR 27 2001 | |
| | Notified counsel by telephone. | | date docketed | 35 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 4/26/2001 | |
| JS | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | JS mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JUDITH HILT-DYSON, | ) |
| Plaintiff, | ) |
| v. | ) No. 99 CV 6307 |
| THE CITY OF CHICAGO, | ) |
| Defendant. | ) |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

Plaintiff Judith Hilt-Dyson, a police officer with the Chicago Police Department ("CPD") filed a complaint against defendant City of Chicago alleging hostile environment sexual harassment and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.. Defendant City has filed a motion for summary judgment. Plaintiff responded to the motion and filed a motion to strike portions of the City's statement of facts largely on relevance and materiality grounds. The City responded to plaintiff's motion and filed its own motion to strike. Rather than address the motions to strike independently, this court considered the arguments raised in the motions to strike in ruling on defendant's motion for summary judgment. For the following reasons, defendant's motion for summary judgment is GRANTED. The parties' motions to strike are both DENIED.

1

## STATEMENT OF FACTS[1]

The facts, viewed in the light most favorable to the plaintiff, are as follows. Plaintiff is a female officer of defendant City of Chicago Police Department ("CPD"). Plaintiff has been a police officer with the CPD since February 11, 1980. From 1998 until February 10, 2000, plaintiff was detailed to the CPD's Evidence and Recovered Property Section ("ERPS"). The function of ERPS is to intake, process, store, and destroy confiscated weapons, narcotics, and other property. ERPS is a caged area with a counter, mailroom, several vaults, and several offices.

Lieutenant William Sutherland became the Commanding Officer for ERPS in February 1999. Prior to that time, plaintiff and Lt. Sutherland did not know each other. Plaintiff claims that on March 24, 1999, while she was working in a vault computer area at ERPS, Lt. Sutherland placed his left hand in the middle of her back and while rubbing her back, moved his left hand to her right shoulder and squeezed it. Plaintiff does not recall how many seconds this contact with her back and shoulder lasted, but she is sure that it was less than one minute. Plaintiff testified that Lt. Sutherland did not touch her anywhere other than her back and shoulder on March 24, 1999. Plaintiff testified that after the incident, she immediately felt violated. Plaintiff does not recall reporting the March 24 touching to a supervisor on that date. Lt. Sutherland does not remember the alleged incident.

Plaintiff also claims that the following day, March 25, 1999, while she was having lunch in the mailroom with several other officers, Lt. Sutherland entered the mailroom and greeted her and the other personnel. After resuming eating her lunch and while facing her desk, plaintiff maintains that Lt. Sutherland firmly placed his left hand on the left side of her back and rubbed her back in an

---

[1] The following statement of facts comes from the parties' Local Rule 56.1(a) and 56.1(b) statements of material facts and accompanying exhibits.

up and down, zig-zag motion while moving his left hand toward her right shoulder. Plaintiff claims that after Lt. Sutherland's left hand reached her shoulder, he removed his left hand from her body. Plaintiff testified that the touching made her feel violated because a supervisor "had no business [to] put his hands on me." Plaintiff does not recall how long Lt. Sutherland's left hand was in contact with her back and shoulder on March 25, 1999. Plaintiff testified that Lt. Sutherland did not touch her anywhere other than her back and shoulder on March 25, 1999. Officer Bland, who witnessed the March 25, 1999 contact, testified that it appeared to him that Lt. Sutherland touched plaintiff only "to get her attention and say goodnight." Plaintiff claims that after Lt. Sutherland made contact with her back and shoulder, she said "Lieutenant, you like touching me." According to plaintiff, Lt. Sutherland responded by saying "I was just trying to get your attention." Plaintiff testified that she responded: "I listen very well." Plaintiff states that after she said that, Lt. Sutherland responded by saying, "I won't touch you anymore." After the March 25, 1999 incident, Lt. Sutherland did not touch plaintiff again.

In a To-From Report dated March 26, 1999, plaintiff notified Abel Presas, the Commander of the General Support Division of the CPD, about the alleged contact between plaintiff and Lt. Sutherland on March 24 and 25, 1999. Plaintiff claims that those contacts constituted sexual harassment. Pursuant to the CPD's sexual harassment policy, on or about March 26, 1999, a Complaint Register ("CR") was initiated against Lt. Sutherland regarding the alleged back and shoulder contact on March 24 and 25, 1999. A CR is an investigation initiated when allegations of violations of CPD rules and regulations are made against a CPD member. The Office of Professional Standards investigated the incident and determined that the CR should be sustained and that Lt. Sutherland should be suspended for two days. Lt. Sutherland's supervisors rejected this

3

determination and issued a final determination that the allegations in the CR were not sustained, meaning that the CPD concluded that there was insufficient evidence to prove or to disprove the allegations in the CR.

On a regular basis at ERPS, plaintiff wore a utility uniform consisting of a dark blue police shirt, dark pants, name tag, star, black leather belt, and shoes. Sworn CPD officers at ERPS were also required to maintain dress uniform, including a blazer, shirt, hat, and gun belt with gun and accessories. Pursuant to a general order, unit commanding officers were required to conduct an annual inspection of the unit members' spring/fall dress uniform between May 1 and May 10. The purpose of the uniform inspection is to make sure that the uniforms fit, that they comply with CPD standards, that they are serviceable, and that they are not worn out. Uniform inspections at ERPS are less formal than uniform inspections in police districts. Because space is limited at ERPS, uniform inspections are conducted in the hallway. The goal of the uniform inspections at ERPS is to return the members to their work stations as soon as possible after the inspection.

On May 6, 1999, Lt. Sutherland conducted a spring/fall dress uniform inspection at ERPS. Plaintiff and two other officers, Doyle and Burton, both male, were inspected at the same time. Though plaintiff was not the first in line, Lt. Sutherland inspected plaintiff first. Plaintiff testified that Lt. Sutherland skipped over the first officer in line, stood directly in front of her, and "did clearly focus his gaze upon my chest area in such a way as to give the very clear impression that his focus was not consistent with what could reasonably be considered professional." At the May 6, 1999 inspection, plaintiff wore her dress uniform, which included a sport coat or blazer that is referred to by the CPD as a "blouse." Underneath her blouse, plaintiff wore a shirt and a fully-equipped gunbelt. During the inspection, Lt. Sutherland told plaintiff that her uniform blazer was snug. Lt.

4

Sutherland then directed plaintiff to raise her arms. Lt. Sutherland testified that he asked plaintiff to raise her arms to determine her range of motion to withdraw her weapon because her blouse appeared too tight to him. One of the male officers involved in the inspection testified that plaintiff stated: "Lieutenant, let me get this right. Are you telling me to raise my arms?," and Lt. Sutherland answered "yes." The officer testified that Lt. Sutherland was "standing right up on her when she did this," that tears were forming in plaintiff's eyes, and that Lt. Sutherland was almost eye level with plaintiff's chest Another male co-worker testified that the incident was "demeaning" and "in direct disregard of the concepts and guidelines of sexual equality set forth by this department."

Prior to May 6, 1999, Lt. Sutherland had instructed male officers and other female officers to raise their arms during uniform inspections. Other supervisory personnel besides Lt. Sutherland have also asked CPD members to raise their arms during uniform inspection to see if their blazers fit. During the May 6 inspection, Lt. Sutherland also asked plaintiff to remove her hat. Plaintiff handed her uniform hat to Lt. Sutherland. Lt. Sutherland told plaintiff that her hat brim had scratches and that the hat's metal shield was dull. Lt. Sutherland then instructed plaintiff to unbutton and open her uniform blazer. Lt. Sutherland contends that he asked plaintiff to open her blazer to inspect the items in plaintiff's gun belt. Plaintiff believes that he made the requests of plaintiff to embarrass and humiliate her because she had complained of his sexual harassment.

Lt. Sutherland contends that he gave the same instructions to the other two officers. Plaintiff contends that Lt. Sutherland did not subject the other two officers to "the same type" of inspection, and that they were not asked to raise their arms. Lt. Sutherland ordered plaintiff to hand him her service revolver. Lt. Sutherland then inspected plaintiff's service revolver. Lt. Sutherland did not touch plaintiff at any time during the May 6, 1999 uniform inspection. During the inspection, Lt.

5

Sutherland directed plaintiff to correct her uniform deficiencies. After plaintiff was inspected, she was dismissed. Plaintiff then left the inspection area and went to her ERPS locker to change from her dress uniform and into her utility uniform so that she could return to work. On or about May 11, 1999, plaintiff ordered a new dress uniform blouse and shied and had her hat replaced. Every year, each police officer receives an allowance to buy, replace, and maintain her uniform. In 1999, plaintiff received an allowance of $1,100, which covered the costs of replacing the items that Lt. Sutherland found deficient during the May 6, 1999 uniform inspection.

On or about May 6, 1999, plaintiff requested that a CR be initiated against Lt. Sutherland because she felt that his order directing her to raise her arms and remove her hat during the dress uniform inspection was discriminatory. On July 16, 1999, the Office of Professional Standards sustained plaintiff's complaint and recommended that Lt. Sutherland be suspended for two days. That recommendation was rejected by Lt. Sutherland's supervisors, who concluded that the evidence was insufficient to warrant any discipline and issued a finding exonerating Lt. Sutherland.

On the morning of January 8, 2000, approximately seven months after the May 6, 1999 inspection, plaintiff was working overtime at ERPS. Officer Ellen Rake was also working at ERPS that morning. Officer Rake had been assigned to ERPS since June 1999 in a light-duty capacity because she has a metal plate in her back and an injured knee. At approximately 8:25 a.m. on January 8, 2000, Officer Rake was in the mailroom talking to another employee about a piece of missing property. Plaintiff was also in the mailroom at the time and described the conversation between Rake and the other employee as Rake speaking in a loud, profane voice and swearing while the other employee responded without using profanity. Then, according to plaintiff, Rake called plaintiff's name and said "Judy [plaintiff] didn't they find the god damn property on your watch last

6

night." Plaintiff maintains that she then turned from her desk, walked to Rake, and jokingly said "girl stop cursing and go back to the A vault." Plaintiff maintains that, during the incident, she slightly and momentarily touched Rake's arm and immediately apologized. Rake has a different recollection of the incident, stating that plaintiff approached her from behind, pulled her shoulder, flung her around, and grabbed at least one of her arms at the forearm and tugged her out of the mailroom, a distance of about 10 feet. Plaintiff admits that she knew Officer Rake had a back injury and was on light duty at the time of the incident.

Lt. Sutherland then entered the mailroom and brought plaintiff and Officer Rake into the supervisor's office. Sargent Victor Mitkal was also present during the mailroom incident and during the meeting in the supervisor's office. According to Lt. Sutherland, Rake told him that plaintiff had grabbed her and pulled her out of the mailroom and plaintiff explained that the touch had been unintentional. Plaintiff claims that Lt. Sutherland twice asked Officer Rake in a loud voice if she was injured and Rake twice responded: "No, I'm not injured." Plaintiff claims that Lt. Sutherland then asked Rake if she wanted a CR number on plaintiff, and Rake responded that she did not. Lt. Sutherland then asked every one to disperse and write a "To-From" report regarding the contact.

Officer Rake testified that following the meeting, her back was feeling tender, so she decided that she did want an Injury on Duty ("IOD") report to "cover herself." Rake testified in her deposition that she told plaintiff that it was not personal, but in order to get an IOD report, she had to initiate a CR, and then told Sgt. Mitkal that she wanted an IOD report made. Plaintiff testified that Rake spoke to Lt. Sutherland alone and then told plaintiff: "Judy this is bull shit. He told me I have to get a CR#." According to Sgt. Mitkal, Lt. Sutherland then instructed him to complete and IOD report for Rake. It was the responsibility of Sgt. Mitkal, as Rake's immediate supervisor, to

7

prepare the IOD report when Rake requested it. Under the CPD rules, the filing of an IOD report requires that a CR be initiated when the injury was caused by a CPD member.

In her To-From report concerning the incident with plaintiff, Officer Rake stated that plaintiff had grabbed her arms and began tugging, and that she told plaintiff not to pull on her because she had a metal plate in her back. Lt. Sutherland also submitted a To-From report and provided a formal statement which cooborated Rake's account, stating that he was approximately 20 feet away from the incident in the vault when he heard shouting and tussling coming from the mailroom. He stated that he looked up and saw plaintiff grab Rake by both her arms and pull her out of the cage. Lt. Sutherland explained the meeting, that Rake initially stated that she did not want to initiate a CR investigation, and that minutes after the meeting Rake approached him, informed him that she was experiencing back pain, and requested that a IOD report be prepared and a CR be initiated. Lt. Sutherland further wrote that he instructed Sgt. Mitkal to do the paperwork. Another employee also cooborated Rake's version of the incident, stating that she had seen plaintiff pull Rake by the arm. Based upon the reports and statements, the Office of Professional Standards ("OPS") recommended that plaintiff be suspended for seven days. Plaintiff appealed that decision to a Complaint Review Panel, arguing that she did not have malicious intent, evidenced by the fact that Rake did not want to initiate a CR report. After reviewing the reports and hearing from plaintiff, the Panel rejected the OPS's findings regarding the incident on May 27, 2000, finding that the evidence did not establish intentional physical contact.

Plaintiff submitted to a formal interrogation on the Rake charge by OPS on February 10, 2000. Plaintiff submitted evidence showing that on February 11, 2000, her personal physician observed that she was extremely distressed and felt that she was unable to return to work under the

8

present circumstances. Plaintiff's physician prescribed antidepressant and anti-anxiety medication and referred her to a psychiatrist. The CPD ordered plaintiff to be examined by its psychologist after plaintiff reported her condition. The tests administered by the City's psychologist indicated emotional distress, including headache, nervousness, crying, and sleep problems. The psychologist concluded that plaintiff was suffering from symptoms of adjustment disorder and emotional distress.

## STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the nonmovant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1996). This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.

A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 106 S. Ct. 2548, 2553 (1986). There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249, 106 S. Ct. at 2511. Only admissible evidence can be considered in ruling on a motion for summary judgment. Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir. 1995) (Hearsay evidence "could not be considered in the summary judgment proceeding.").

9

ANALYSIS

Plaintiff maintains that the March 24 and 25, 1999 touching encounters with Lt. Sutherland and the May 6, 1999 uniform inspection constitute sexual harassment. Plaintiff also complains that she was retaliated against for complaining about sexual harassment when the CR was initiated against plaintiff in January 2000 for the physical contact she had with Rake on January 8, 2000.

I.  Sexual Harassment Claim

Title VII prohibits an employer from "discriminating] against any individual with respect to [ ] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1) (1994). Sexual harassment is actionable under Title VII only if it is "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." Clark County School Dist. v. Breeden, --- S. Ct. ----, 2001 WL 402573, at *1 (U.S. Apr. 23, 2001) (internal quotations omitted); Hostetler v. Quality Dining, Inc., 218 F.3d 798, 806 (7th Cir. 2000). Whether the harassment rises to this level turns on a constellation of factors that include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Hostetler, 218 F.3d at 806-07 (internal quotations omitted). Under the law of the Seventh Circuit, the impact of the harassment upon the plaintiff's work environment is measured both objectively and subjectively. The work environment cannot be described as "hostile" for purposes of Title VII unless a reasonable person would find it offensive and the plaintiff actually perceived it as such. Id. (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 2283 (1998)). The harassment must be sufficiently severe that a rational trier of fact could find that it had actually changed the conditions of the plaintiff's

10

workplace. Silk v. City of Chicago, 194 F.3d 788, 804 (7th Cir. 1999).

The City has not challenged, and this court accepts for purposes of this motion, that plaintiff subjectively perceived her working environment to be hostile. Nonetheless, plaintiff cannot survive summary judgment unless she can show that a reasonable person would have found the work environment to be sufficiently hostile. This court finds that plaintiff cannot meet that burden under the law of the Seventh Circuit.

The Seventh Circuit has observed that drawing the line between unpleasant work behavior and actionable objectively hostile work environment is not always easy. "On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430-31 (7th Cir. 1995).

Here, the two back-rubbing and shoulder-squeezing incidents of which plaintiff complains can undoubtedly be viewed as nonconsensual physical conduct. Unwelcome touching of an intimate nature falls on the actionable side of the line dividing abusive conduct from behavior which is merely vulgar or mildly offensive. Hostetler, 218 F.3d at 807. However, this court doubts that a reasonable trier of fact could determine that the Lt. Sutherland's alleged rubbing of plaintiff's back approaches the conduct found actionable in Hostetler, which involved a coworker inserting his tongue into the plaintiff's mouth without invitation and nearly removing her brassiere. However, even if the back rubs were unquestionably actionable behavior, they still cannot form the basis of a sexual harassment claim unless the finder of fact could label the work environment as hostile

"notwithstanding the limited number of the acts involved." Id. at 808. There is no "magic number" of incidents required to establish a hostile environment. Id. Even one act of harassment will suffice if it is egregious. Id.

Here, plaintiff alleges two acts of unwanted back-rubbing, each lasting for no more than one minute, on two consecutive days. The conduct ended when, during the second touching, plaintiff made her displeasure known, Lt. Sutherland stated that he would stop, and kept that promise. The Seventh Circuit has recognized that there are some forms of physical contact which, "although unwelcome and uncomfortable for the person touched, are relatively minor." Hostetler, 218 F.3d at 808. As the Seventh Circuit reasoned in Hostetler:

> Cumulatively or in conjunction with other harassment, such acts might become sufficiently pervasive to support a hostile environment claim, but if few and far between they typically will not be severe enough to be actionable in and of themselves. A hand on the shoulder, a brief hug, or a peck on the cheek lie at this end of the spectrum. Even more intimate or more crude physical acts--a hand on the thigh, a kiss on the lips, a pinch of the buttocks--may be considered insufficiently abusive to be described as "severe" when they occur in isolation. When the harassment moves beyond the sort of casual contact which (if it were consensual) might be expected between friendly co-workers, and manifests in more intimate, intrusive forms of contact, it becomes increasingly difficult to write the conduct off as a pedestrian annoyance.

Id. (internal citations omitted). In Hostetler, the Seventh Circuit reasoned that the proposition that no reasonable person could think two acts were severe enough to alter the plaintiff's work environment, without the added weight of repetition over time or cumulation with other acts of harassment, became dubious when the conduct at issue involves unwelcome contact with the intimate parts of one's body. Id. at 808-09. Here, plaintiff alleges that both instances of unwanted

12

touching occurred somewhere between her mid-back and her shoulder, not in any intimate parts of her body. Plaintiff herself submits that the touching was the type of contact which would be appropriate for a "close friend, but was out of place for a supervisor." (Pl. Resp. at n.1.) Plaintiff has thus admitted that the two touches where the sort of contact that (if consensual) would be expected between friendly co-workers and thus falling on the side of a "pedestrian annoyance." See id. at 808. This case thus involves the sort of "hand on the shoulder" which, although uncomfortable for plaintiff, was objectively relatively minor.

Plaintiff argues that, seen in conjunction with the uniform inspection incident, in which Lt. Sutherland "singled plaintiff out for an embarrassing and humiliating display," Lt. Sutherland's actions crossed the line to actionable harassment. Plaintiff argues that the conduct was "repetat[ive]" and "far more than a few isolated instances of non-severe conduct." Unfortunately, the facts, as admitted by plaintiff and viewed in the light most favorable to her, do not support plaintiff's arguments. Plaintiff admits that there were only two back-touching incidents, which ended as soon as plaintiff made her displeasure known, in addition to the uniform inspection. Plaintiff's characterization of the uniform inspection incident is insufficient to save plaintiff's sexual harassment claim. Even accepting that Lt. Sutherland did not ask the male officers to raise their arms or remove their hats, one improper incident of leering or picking plaintiff out for close scrutiny is not actionable conduct, even when viewed in conjunction with the touching incidents more than one month prior. Plaintiff does not dispute that Lt. Sutherland and other supervisory officers had instructed both male and female officers to raise their arms during uniform inspections in the past. While a close inspection of one's clothes, including the chest area, might be objectionable in some jobs, the same cannot be said of a police organization with firm uniform rules and mandatory

13

uniform inspections. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82, 118 S. Ct. 998, 1003 (1998) (assessment of the objective severity of the harassment must be made with "an appropriate sensitivity to social context").

Plaintiff relies almost entirely upon Smith v. Sheahan, 189 F.3d 529 (7th Cir. 1999), for the proposition that Lt. Sutherland's two alleged back-rubbing incidents alone are sufficiently severe to form the basis of a sexual harassment claim. In that case, the Seventh Circuit held that a single assault was enough to warrant a trial on a hostile work environment claim. However, the assault involved in Smith damaged the plaintiff's wrist to the point that surgery was required. The court there reasoned: "Although less severe acts of harassment must be frequent or part of a pervasive pattern of objectionable behavior in order to rise to an actionable level, 'extremely serious' acts of harassment do not." Id. at 534 (citing Faragher, 118 S.Ct. at 2283). This case is far more in line with the numerous cases in which the Seventh Circuit has found isolated and innocuous incidents not sufficient to form the basis of a sexual harassment claim, and plaintiff's attempts to distinguish those cases is to no avail. See e.g. Koelsch v. Beltone Electronics Corp., 46 F.3d 705, 706-07 (7th Cir. 1995) (one instance of defendant removing shoe and rubbing plaintiff's thigh with foot, one instance of grabbing plaintiff's buttocks, asking for dates and telling off-color jokes not sufficient to survive summary judgment on hostile work environment claim); Saxton v. American Tel. & Tel. Co., 10 F.3d 526 (7th Cir. 1993) (two incidents of misconduct by supervisor, one involving a knee rub and fumbled kiss and the other involving an attempted grab, insufficient to find liability on sexual harassment claim).

In the end, plaintiff's argument that the alleged incidents of sexual harassment were severe seems to rest entirely on the fact that she subjectively viewed the incidents as such. However, this

14

court must judge the severity of the incidents under an objective standard following the law of the Seventh Circuit, which makes clear that the conduct at issue, including its brevity and its lack of repetition, is not the type which a reasonable person would find sufficiently severe to form the basis of a sexual harassment claim. The undisputed facts demonstrate that the conduct to which plaintiff was subjected was not the type that a rational trier of fact could find had actually changed the conditions of plaintiff's workplace, and therefore cannot survive summary judgment. See Silk v. City of Chicago, 194 F.3d 788, 804 (7th Cir. 1999).

II.  Retaliation Claim

Plaintiff claims that Lt. Sutherland retaliated against her for complaining of his alleged sexual harassment in touching plaintiff's back by performing the uniform inspection and for complaining of the uniform inspection and filing a charge with the EEOC by initiating the CR investigation against plaintiff for the incident with Officer Rake. Section 704 of Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Lacking any direct evidence of retaliatory intent, plaintiff seeks to fit her claim within the McDonnell Douglas framework. A prima facie case of retaliation under Title VII requires the plaintiff to present sufficient evidence that: (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) there is a causal link between the protected expression and the adverse action. Russell v. Board of Trustees of the University of Illinois at Chicago, 2001 WL 225051, at *6 (7th Cir. Mar. 8, 2001). In order to demonstrate the "causal link," the plaintiff must demonstrate that the employer would not

have taken the adverse action "but for" the protected expression. See Johnson v. University of Wisconsin-Eau Claire, 70 F.3d 469, 479 (7th Cir. 1995). If the plaintiff gets this far, the defendant must then come forward with a legitimate business reason for taking the employment action; if it does so, the plaintiff may survive summary judgment only by presenting sufficient evidence that the defendant's justification is pretextual. See Russell, 2001 WL 2250501 at *6.

As noted, an employee proceeding under the McDonnell Douglas burden-shifting method must show that she suffered a "materially adverse employment action." The Seventh Circuit has defined the phrase broadly, including readily quantifiable losses such as loss or reduction of pay or monetary benefits, in addition to many other forms of adversity. See Smart v. Ball State University, 89 F.3d 437, 441 (7th Cir. 1996) (citing examples). However, minor or trivial actions that make an employee unhappy are not sufficient to qualify as materially adverse employment actions under the law. See id. Here, it is unclear whether plaintiff is claiming that the May 1999 uniform inspection performed by Lt. Sutherland was retaliation for her complaints against him. To the extent she makes such a claim, plaintiff's claims cannot survive summary judgment because the uniform inspection was not a materially adverse employment action. It is undisputed that uniform inspections are a regular part of life in the CPD, and that plaintiff, like all other officers, has a uniform allowance to cover expenditures for uniform expenses. Plaintiff does not dispute that her uniform was not in compliance with CPD rules, including a snug "blouse" (blazer), scratched hat brim, and dull metal shield. Plaintiff also does not argue that she was financially burdened by replacing those items. Accordingly, the uniform inspection was, at most and as admitted by plaintiff, "part of an ongoing pattern of [non-actionable] harassment," not a materially adverse employment action in itself.

This court will assume for purposes of this motion that the initiation of the CR investigation

16

against plaintiff was a materially adverse employment action, though it is doubtful that the investigation alone, unaccompanied by any tangible job consequences, would be considered an adverse employment action under the law of the Seventh Circuit. See Sweeney v. West, 149 F.3d 550, 556 (7th Cir. 1998). Plaintiff's retaliation claim fails because she cannot show that the initiation of the CR investigation was a pretext for retaliation. Plaintiff does not dispute that Rake requested an IOD report on her own free will. Plaintiff also does not dispute that once an officer requests an IOD report for an injury caused by a CPD member, the supervisor must initiate a CR investigation under the CPD rules. Accordingly, even if this court were to accept plaintiff's hearsay evidence that Rake told her "he's making me fill out a CR," that inadmissable evidence would still not be sufficient to save plaintiff's claim that Lt. Sutherland forced Rake to initiate the CR investigation because it is undisputed that under CPD rules, once Rake requested an IOD report, a CR investigation had to be initiated. Again, plaintiff does not dispute that Rake made the decision to fill out an IOD report on her own free will. For the same reason, it is irrelevant that plaintiff successfully challenged her suspension on the basis that the touching was unintentional; unintentional or not, when one officer requests an IOD report and the cause of the injury was another officer, CPD rules require the initiation of a CR investigation. Accordingly, defendant has presented a legitimate, non-discriminatory reason for its decision and plaintiff has not presented any admissible or inadmissable evidence that the stated reason is "a lie, specifically a phony reason for some action." Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir. 1995); see also Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000) (to show pretext, plaintiff must present evidence that each of the proffered reasons is either a lie or completely lacking a factual basis). Accordingly, plaintiff's retaliation claim must fail.

## CONCLUSION

For the reasons stated, defendant's motion for summary judgment is GRANTED. This case is DISMISSED in its entirety. All pending motions are moot.

ENTER:

*James F. Holderman*
JAMES F. HOLDERMAN
United States District Judge

DATE: April 26, 2000